U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

Case 4:23-cr-00019-P   Document 1   Filed 11/07/22   Page 1 of 12   PageID 1

FILED

NOV - 7 2022

CLERK U.S. DISTRICT COURT
By: _____
                    Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA

v.                                                       No. 4:22-MJ-_900_____

BILLY ANDRE CROSS                    (01)
a/k/a "Unc"

JOSHUA LAMAR HALLMAN             (02)
a/k/a "Josh"

## CRIMINAL COMPLAINT

I, Task Force Officer (TFO) Christian A. Abrahim, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

**Alleged Offense:**

Beginning on a date unknown but no later than in or about July of 2022 and continuing until in or about August 17, 2022, in the Fort Worth Division of the Northern District of Texas and elsewhere, defendants **Billy Andre Cross**, also known as Unc and **Joshua Lamar Hallman**, also known as Josh, along with others known and unknown, did knowingly and intentionally combine, conspire, confederate, and agree to engage in conduct in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A), namely to distribute and possess with intent to distribute 50 grams or more of methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(A).

**Probable Cause:**

1.    I am a TFO with the Drug Enforcement Administration (DEA) assigned to the DEA Task Force, Group 1, of the Fort Worth District Office (FWDO). The statements set forth in this affidavit are from my personal observations, my training and experience, and from information obtained from other law enforcement officers and witnesses. The facts presented are true and correct to the best of my knowledge and belief but are not inclusive of all the evidence or information in the case.

Criminal Complaint - Page 1

2.      In or around June of 2022, a DEA confidential source (CS) informed the DEA FWDO

of a person the CS knew as "J" or "J Money" being a kilogram distributor of methamphetamine

and other illicit drugs in the Fort Worth area.  The CS said "J" distributed and oversaw

distribution of methamphetamine, fentanyl, and black tar heroin from a "trap" or drug

distribution residence located at 5214 Bryant Irvin Road, Apartment #3170, in Fort Worth,

Texas.  The CS also said "J" had two others distributing drugs with "J" at the Bryant Irvin

Road apartment who the CS knew as "Unc" and "Josh."  Using recent digital Texas driver's

license or identification photos presented to the CS, "J" was identified as Jordan Jaquan

Mayfield, "Unc" was identified as **Billy Andre Cross**, and "Josh" was identified as **Joshua**

**Lamar Hallman**.  The CS is a credible and reliable source that has been used in several

successful operations prior to this investigation.

3.      The CS also provided **682-774-6846** as a phone number for "J."  A query of law

enforcement deconfliction databases revealed the **6846** number was used by Jordan Jaquan

Mayfield, which also showed Mayfield went by "J" and "J Money."

4 .     The CS explained that he/she would typically arrive unannounced at a residence

Mayfield controlled to purchase drugs as the CS would only deal with Mayfield directly.  The

CS said that prior to his/her activation, he/she would purchase the drugs from Mayfield, and

he/she has observed **Hallman** physically handling the suspected drug proceeds and

prepackaging and/or weighing drugs for potential drug sales.  If it was a large order for drugs,

the CS said he/she would contact Mayfield on the **6846** number first.

Criminal Complaint - Page 2

The CS provided the Bryant Irvin Road apartment as a place Mayfield, **Hallman**, and **Cross** used to distribute drugs.

5.      On or about July 14, 2022, the DEA FWDO had the CS place a recorded phone call to Mayfield at the **6846** number to purchase around a pound of methamphetamine.   In the recorded call, Mayfield answers and asks the CS what the CS was wanting. The CS replied, "The 16 this time," or words to that effect.  Mayfield replied with words to the effect of, "The blue bell?" The CS replied, "Yeah," and Mayfield responded, "Yeah, come on." or words to that effect.  I know from my training and experience, the term "blue bell" is referring to crystal methamphetamine.

6.      After the phone call between the CS and Mayfield, the DEA FWDO provided the CS with $2,800 in official funds and prepared the CS to make a video-recorded controlled buy of the methamphetamine from Mayfield at the Bryan Irvin Road apartment.  In accordance with standard protocol for controlled drug buys using a CS, the CS was searched and confirmed the CS did not have any contraband or money other than the DEA-provided funds. The CS was then provided a video-recording device and placed into a DEA undercover car with a DEA undercover agent.

7.      They drove to the Bryant Irvin Road apartment where the CS got out of the passenger side of the undercover car, proceeded to apartment 3170, and met with Mayfield. Inside, the CS provided Mayfield with the $2,800 in official funds, counting it out for Mayfield, and Mayfield gave the CS a bag containing the methamphetamine.

The CS returned to the undercover car with the methamphetamine, and they drove back to a predetermined location for debriefing. A later laboratory analysis confirmed the CS had bought around 430 grams of methamphetamine.

8.     On or about August 3, 2022, the DEA FWDO along with Fort Worth Police Department Narcotics Unit conducted pre-buy surveillance using ground and DEA aerial units. During the course of this surveillance, investigators saw Mayfield and **Hallman** driving two vehicles, namely a white Dodge Challenger, which **Hallman** drove, and a silver passenger car, which Mayfield drove. These vehicles were followed for multiple hours and investigators watched **Hallman** and Mayfield driving in tandem in and around the Dallas Fort Worth area. From my training and experience, I know people involved in the drug-trafficking trade often drive in tandem with another co-conspirator as a way to evade law enforcement. One car will contain the contraband or the fruits of drug trafficking, while the other car won't contain anything but will be used to attract law enforcement's attention. Indeed, on a later date, a cooperating defendant (CD) was interviewed and questioned about this specific occurrence, and the CD said that on or about August 3, 2022, both Mayfield and **Hallman** were in possession of around $20,000 in drug proceeds and specifically drove in tandem to safeguard the proceeds in fear of potential seizure from law enforcement should they get stopped.

9.     While continuing the surveillance operation, investigators followed **Hallman** and Mayfield to the Bryant Irvin Road apartment prior to a planned controlled buy-walk operation with the CS. After seeing **Hallman** and Mayfield enter the Bryant Irvin Road apartment, the DEA FWDO had the CS contact Mayfield to purchase another pound of methamphetamine.

Criminal Complaint - Page 4

In the recorded call, Mayfield answers and asks the CS what the CS was wanting. The CS replied, "The 16 this time," or words to that effect. Mayfield then indicates to the CS that he is low on methamphetamine supply and would not be able to fill the order at that time. Hours later the CS again contacts Mayfield and the CS requests an amount of black tar heroin and pills known as "blues" or "percs." Mayfield replied, "Yeah, come on," or words to that effect.

10.    Prior to the phone call between the CS and Mayfield, DEA FWDO had provided the CS with $2,800 in official funds and prepared the CS to make a video-recorded controlled buy of methamphetamine from Mayfield. Again, in accordance with protocol, the CS and CS's vehicle was searched and confirmed the CS did not possess any contraband or money other than the DEA-provided funds.

11.    The CS indicated to Agents that based on the phone calls between the CS and Mayfield, the CS could buy around two ounces of black tar heroin and about 100 fentanyl pills from Mayfield at the Bryant Irvin Road apartment. The covert recording devices were activated, and the CS was placed into his/her car and followed by agents to the Bryant Irvin Road apartment and followed by the DEA Airwing.

12.    The CS drove to the Bryant Irvin apartment and proceeded to apartment 3170. Inside, the CS met with Mayfield and requested two ounces of black tar heroin and 100 fentanyl pills. The CS provided Mayfield with the $2,800 in official funds, counting it out for Mayfield while in the presence of **Hallman** and **Cross**. Moments later, Mayfield gave the CS bags containing the suspected black tar heroin and fentanyl pills.

13.     The CS returned to his/her car and drove to a predetermined location for debriefing.
After the debriefing, DEA FWDO Agents conducted a presumptive field test, which indicated
a positive test result for the presence of fentanyl from the pills and a positive test result for
heroin from the brown tar substance. A later laboratory analysis confirmed the CS had bought
around 48 grams of heroin and around 10 grams of fentanyl.

14.     Thereafter, DEA obtained a federal arrest warrant for Mayfield based on a federal
criminal complaint, charging Mayfield with distributing 50 grams or more of
methamphetamine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A). A federal search
warrant for the Bryant Irvin apartment was also obtained by DEA. The warrants were
executed on or about August 17, 2022.

15.     When DEA entered the apartment, they found Mayfield and **Cross** in the master
bedroom. During the announced entry into the residence, a DEA TFO member of the DEA
SRT Unit saw **Cross** attempt to discard a large plastic bag that a later laboratory test confirmed
contained nearly 500 grams of pure methamphetamine. After entry, both Mayfield and **Cross**
surrendered.

16.     During the search of the apartment, DEA Agents and TFO's located typical drug-
trafficking paraphernalia such as digital scales, small plastic bags, and other drug-distributing
paraphernalia. They also seized numerous bags containing what a later laboratory test would
confirm to be nearly 500 grams of pure methamphetamine, around 500 blue pills containing
the presence of fentanyl, a white powdery substance believed to be cocaine, a black tar
substance believed to be heroin, and a green leafy substance believed to be marijuana.

Criminal Complaint - Page 6

And they located two firearms in the apartment, one of which **Cross** possessed when DEA
SRT members entered the apartment.  **Cross** would later admit he threw a firearm when he saw
the DEA SRT members enter the apartment.

17.     While searching the apartment, DEA Agents and TFO's observed an individual
arriving to the Bryant Irvin Road apartment driving a white Dodge Challenger that was
previously seen being operated by both Mayfield and **Hallman**.  Agents requested Fort Worth
PD patrol units attempt a traffic stop to contact the driver of the car.  Fort Worth PD patrol
units observed the car on a public roadway failing to display a front license plate as required by
the Texas Transportation Code and conducted a traffic stop for the violation.  They identified
the driver as **Hallman** and learned **Hallman** had an outstanding arrest warrant.  **Hallman** was
arrested and the car seized for asset forfeiture.

18.     While conducting an inventory of the white Dodge Challenger in accordance with
standard operating procedure, Agents found a cell phone, a cash receipt showing Mayfield paid
$12,500 in cash for "attorney fees" with a balance owing of $17,500, and a residential door key
to the Bryant Irvin Road apartment.  **Hallman** claimed the cell phone in the car did not belong
to him.  Toll records obtained from Mayfield's phone during the investigation into Mayfield's
drug trafficking indicated that **Hallman** was using a cell phone with the number 817-679-1895.
The cell phone seized from the Challenger was later identified as the 817-679-1895 cell phone.
Investigators observed the device's number in plain view (817-679-1895) on **Hallman's**
device located during the inventory search and analyzed conversations with that number during
the forensic search of Mayfield's cell phone in accordance with the federal search warrant.

Criminal Complaint - Page 7

Based on this analysis, investigators determined that the user of 817-679-1895 was a contact listed on Mayfield's phone as **"Josh"** who was involved in daily drug trafficking from the Bryant Irvin Road apartment.

19.     **Hallman** was read his *Miranda* warning, voluntarily waived them, and spoke with Fort Worth Officer Perry Moore and other surrounding Investigators. **Hallman** admitted he was involved in the distribution of drugs from the Bryant Irvin Road apartment and said he "sold drugs 2-3 times" for Mayfield. **Hallman** also said he hadn't "had a job in two years."

20.     **Cross** was also interviewed after being advised and voluntarily waiving his *Miranda* rights. **Cross** said he is Mayfield's uncle and admitted he recently began frequenting Mayfield's Bryant Irvin Road apartment. **Cross** admitted Mayfield paid him $80 a day to distribute drugs at the Bryant Irvin Road apartment. **Cross** also said Mayfield compensated him with 10 fake M-30 Oxycodone pills a day, which he referred to as "Blues." **Cross** said he has distributed drugs for Mayfield and **Hallman** "7-8 times" between August 1 and 17, 2022.

21.     **Cross** said he never saw **Hallman** distribute drugs to customers at the Bryant Irvin Road apartment, but said **Hallman** ordered him to answer the door for customers in order to distribute drugs. **Cross** said he did see **Hallman** leave the Bryant Irvin Road apartment with drug proceeds, described as US currency. **Cross** said he has overheard Mayfield and **Hallman** discuss their drug-trafficking activities, and he knows **Hallman** "went in half on" the fake M-30 Oxycodone pills.

22.     In a later interview, a CD said while at the Bryant Irvin Road apartment, **Hallman** had invested approximately $5,000 through the CD for 5,000 fake M-30 pills.  The CD stated that in return the CD paid **Hallman** $20,000 after the distribution of said pills.  The CD stated that **Hallman's** involvement in the conspiracy was to collect and store drug proceeds from the Bryant Irvin Road apartment and to periodically distribute fake M-30 pills.  The CD would not give a daily drug distribution amount for **Hallman**.  The CD stated that **Hallman** was good with money and would "invest" his money into the CD's drug distribution because **Hallman** did not have a drug source of his own.  The CD was shown **Hallman's** suspected phone number contact information in the CD's phone (817-679-1895), and the CD confirmed the 1895 phone number belonged to **Hallman**.

23.     The CD was also interviewed about the drug-trafficking activities of **Cross**.  The CD stated he/she had **Cross** sell about 50-100 fake M-30 pills, 2-4 ounces of methamphetamine, and 2-3 ounces of black tar heroin while at the Bryant Irvin Road apartment.  The CD explained that **Cross's** involvement in selling drugs was merely for keeping the Bryant Irvin Road apartment operating when the CD was not there.  The CD also stated **Cross** received fake M-30 pills, which he would smoke, as payment for selling drugs for the CD.

24.     During the month of September 2022, DEA Investigators conducted cell phone analysis on one of Mayfield's cell devices.  One of the conversations analyzed was a text or SMS conversation between Mayfield and **Hallman** via the 817-679-1895 phone number.  Analysis of this conversation consisted of first identifying the drug distribution facilitator and potential customer for each suspected transaction.

Criminal Complaint - Page 9

Further, Investigators recognized suspected drug types, amounts, and prices by training, experience, and intelligence gathered from this DTO.

25.      After analysis of the conversation between Mayfield and **Hallman**, it is believed that as a collective, Mayfield, **Hallman**, and **Cross** distributed at least 774 fake M-30 Oxycodone pills containing fentanyl, 155 grams of methamphetamine, 165.5 grams of black tar heroin, and 120 alprazolam bars between June 19, 2022, and August 6, 2022, from the Bryant Irvin Road apartment.  These messages do not reflect the total amount distributed by the DTO but merely the amount recorded in this single analyzed text conversation involving Mayfield and **Hallman**.

26.      Investigators obtained numerous recorded phone calls Mayfield made from Johnson County to co-conspirators and family members soon after his August 17 arrest.  On August 23, 2022, around 5:19 p.m., Mayfield calls a person he refers to as "T-Bone" and has "T-Bone" connect Mayfield with **Hallman** via a three-way call.  Mayfield tells **Hallman** that the DEA knows about the other drug-distribution locations, and Mayfield tells **Hallman**, "They got pictures of us at North Park Mall when we went shopping."  Mayfield then tells **Hallman**, "I don't need them fucking, I don't need, I don't need, I don't need you on the radar cuz I'm bringing it to your attention for that reason bro," and that he is trying to keep **Hallman** "off the radar."  Mayfield also informs **Hallman** that Mayfield saw a picture of himself holding a large sum of cash, and **Hallman** responds, "that money wasn't even yours."  Mayfield replies that he doesn't want the DEA to know whose money it is, and again reiterates that he doesn't want DEA to know anything about **Hallman**.

Criminal Complaint - Page 10

27.     On August 24, 2022, around 5:14 p.m., Mayfield calls his mother and tells her he spoke with "bro," who is **Hallman**, and "put him on game," meaning he informed **Hallman** on what DEA knows.

28.     On August 24, 2022, around 6:13 p.m., Mayfield is on a phone call with James Mayfield and **Hallman**. Mayfield tells both James and **Hallman** that he gave investigators "the blues" and gave them the detour, referring to his sending investigators to his sister's house to look for drug proceeds. Mayfield informs **Hallman** and James that he told his mother he "made a hell of a move," again referring to deceiving investigators on the location of drug proceeds.

29.     Around 7:25 p.m. on August 24, 2022, Mayfield calls a Quinnesha Watkins and tells her investigators took "$75,000 from sister's house" when they searched Mercedes Mayfield's the residence. Mayfield tells Watkins that while he was speaking to James Mayfield on his previous call, James said he was headed to his mom's house to "move some money." Mayfield also informs Watkins that his mom put "$30,000" towards his new attorney, and he tells her he believes **Hallman** also assisted with payment towards his attorney but is unsure how much.

*[Continued on next page]*

Criminal Complaint - Page 11

Accordingly, based on the above facts and circumstances, there is probable cause to believe that **Billy Andre Cross**, also known as Unc, and **Joshua Lamar Hallman**, also known as Josh, along with others known and unknown, did knowingly and intentionally combine, conspire, confederate, and agree to distribute and possess with intent to distribute at least 50 grams of methamphetamine, a schedule II controlled substance, in violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(A).

_____
Task Force Officer Christian A. Abrahim
Drug Enforcement Administration


SWORN AND SUBSCRIBED before me this ___7TH___ day of November 2022, at 1:31 am/pm, in Fort Worth, Texas.

_____
HAL R. RAY, JR.
UNITED STATES MAGISTRATE JUDGE

Criminal Complaint - Page 12